May it please the Court, my name is Rebecca Smith and seated at council table is my co-counsel, Timothy Bechtold. We represent the Alliance for the Wild Rockies and Mr. Bechtold will be addressing the panel on rebuttal and I'd like to reserve five minutes for that rebuttal. The Cabinet Yacht Grizzly Bear is going extinct. Ten years ago, the Fish and Wildlife Service determined that the standards it was implementing were failing and that the bear population was in danger of extinction. Now, ten years later, the agencies are implementing weaker versions of those standards, yet at the same time asserting that there is no adverse impact on this grizzly bear population, while at the same time watching this bear population slide into extinction. Continuing to implement standards that it knows are failing is arbitrary and capricious and the agencies must be enjoined from implementing these lethal standards or there really is no hope to stop the slide. But just on targeting specifically, I am just a little bit confused as to exactly which  standards. Okay. The first claim that Alliance has is that the standards being implemented in this project violate the Endangered Species Act. But what standards are you talking about when you say that? The 2006 rule set are the standards that we're talking about and those are found Okay. Are you talking about anything other than the 2006, what you call the 2006 rule set, which I understand to be the Johnson Memoranda? That's correct. So we're challenging those standards for violating the Endangered Species Act, but also we're challenging the consultation that happened for this timber sale project as additional, an additional violation of the Endangered Species Act. Which comes from what? I mean, when you're challenging the consultation, that attached to what? The timber sale project, the Northeast Act project, had its own additional consultation. Are you talking about 2007 or are you talking about some other consultation? It was in 2006 is the record of decision, I believe. It's the separate analysis that happened, the supplemental biological assessment that was done for the Northeast Act project is a separate challenge. And the challenge against that is that the agencies came to a conclusion that this specific project wouldn't adversely impact the grizzly bear. And the alliance is asserting that the reason that violates the Endangered Species Act is because they didn't apply the best available science when they analyzed the impact of this specific project. And I have two questions with respect to the 2006, what you call the rule set. First question is how can it be agency action? I mean, these were internal memoranda interpreting or giving a view of the author about the default rules which kicked in once Judge Malloy invalidated the rod. That's the first question. The second question is if, in fact, you're making a challenge to the 2007 supplemental biological assessment and its consultation, then why is the 2006 rule set relevant? Okay. The first question is how is this a rule set when it's an agency interpretation of the law? Is that essentially? No. How can it possibly be an agency interpretation when it simply consists of memoranda written by a junior employee interpreting preexisting standards from, what, 1987 and 2004, which became automatically the default standards once Malloy invalidated the rod? Okay. So the first issue really is that the 2006 rule set, the memorandum, it did not implement the standards that were previously in place. The standards that were previously What difference does it make? Because they came in automatically. Well, the standards that came in automatically would have been the standards from the 1995 biological opinion. Yes. But the standards that are in the 2006 rule set are weaker than that. They're not those Here's my point. That's irrelevant. What the 2006 internal memoranda did is irrelevant for one of two reasons. The preexisting standards came into effect automatically upon the entry of Judge Malloy's judgment. I mean, it's just by the statutory default. So it doesn't matter what the 2006 memoranda said of them. They themselves became into effect. And secondly, on the other end, if you're really saying the 2007 standards supersede because they're the operative documents now, what difference does any of that make anyhow? Well, the 2006 rule set is what they applied in the 2007 supplemental biological assessment. So let me see if I can follow what you're saying. It seems to me that Judge Rimer is correct that what ought to have been applied here was the 1995 biological opinion. And I guess what I'm questioning is, is your argument that you agree with that, but it was not done that way in 2006, 2007, that that's the mistake that the agency made? Yes. The challenge to the 2006 rule set is that it didn't implement the 1995 biological opinion. And the consultation, the supplemental biological opinion also did not do that, is it? Right. The supplemental biological assessment for the project implemented the 2006 rule set, practically verbatim. If you look at the, in the excerpts of record at 156, they call the 2006 rule set their interim guidelines, and they implement that as their guidelines. So I guess what I'm trying to understand, you don't disagree with Judge Rimer's premise that what ought to have happened as a matter of law is the reliance on the 1995 biological opinion. The question is whether that was done or not. Is that fair? That's correct, initially. Alliance would further argue that if the agencies had relied on the 1995 biological opinion, that that would violate the Endangered Species Act, because there's a duty to supplement when there's new information. And those standards were implemented 14 years ago, and in 1999, the Wildlife Service said that those standards were failing and that the bear was still going extinct. So by law, that 1995 buy-up may have been re-implemented. And, but also, if they still relied on that for additional projects in the future, because they have a duty to update that consultation in light of the fact that those standards... That's your main argument, the duty to update, isn't it? Yes. So why do you waste all this time on all these things with Mr. Johnson and all that? You know, you're running off on paths that are going to take you nowhere. Well, the importance, which gets back to... I mean, the important thing, your most, your important argument is that the best available science was not employed. That's correct. Okay, so what else is there? Well, just... Isn't that your best argument? And the fact that the reason that the 2006 rule set still is important is that the agencies are continuing to implement it in projects right now. And so if this Court would rule that that rule set needed to undergo consultation, then the agencies couldn't be continuing to implement that in timber sale projects right now, despite the fact that this... But your best available science argument, that overrides everything. That's correct, Your Honor. Just talk about that. Okay. Before you run out of time, too, and this may or may not relate to Judge Pragerson's question, there was a second motion to modify the injunction pending this appeal, and it said that you didn't have a position yet or the government didn't know whether you did or you didn't. So if you would also address that in addition for this part of your answer to Judge Pragerson. Okay. So I'll address this question first, and then maybe Mr. Bechtold can address the motion on rebuttal, their motion to modify the injunction, which we do oppose, and we did file a response last night to it. Okay. I haven't seen that. Okay. So the best available science that this Court requires that the agencies consider all available science. They've known for the past decade that these habitat standards are failing, and they've watched the grizzly bear slide into extinction. What science do you point to that they should have considered that they didn't? The population trend data. The fact that the important From where? The agency's own monitoring reports indicate that the mortality rate for the grizzly bear has tripled since they've been implementing these standards, and that the probability that the bear is going extinct has jumped from 75 percent to over 90 percent. Okay. What specific piece of paper are we talking about? The Cabinet-UNAC grizzly bear monitoring reports from 2006, the most recent But they considered them, but they didn't necessarily adopt your view of them. Is that required? No, Your Honor, they didn't consider it at all. They didn't consider the fact that It was their own study. Excuse me? That was their own study. They didn't consider the fact when they create these standards, they don't consider the fact that these standards are causing extinction. And I'd like to reserve my remaining time for rebuttal. All right. Good morning, and may it please the Court. I'm Justin Pideaux for the United States. From the panel's questioning of counsel, it appears that there are sort of two issues that sound to me like are of interest, one with respect to this Johnson Memorandum and what its effect is, and the second with respect to the best available science. So I'll address each of those questions and anything else that the Court would like me to do. Why don't you start by indicating, by picking up on the point of the best available science. Certainly, Your Honor. And talk about this Joaquinan study. Certainly, Your Honor. To start with the mortality data, which appears to be now what the Alliance for Wild Rockies is suggesting that the Forest Service didn't consider, if you look at the Supplemental Biological Assessment at Excerpt of Record 160, there is, in fact, a discussion of that mortality data. The Excerpt of Record states and the Supplemental Biological Assessment states that there have been 11 grizzly mortalities between 2000 and 2005, that three of those occurred on Forest Service land, and all that is required under the Endangered Species Act is that that information be considered, and that information has been considered. With respect to the Joaquinan study, there appears to be two lines of argumentation in the briefs that I can identify. One is that the Joaquinan study itself is somehow fatally flawed, and the second is that the Forest Service did not rely on that study and therefore did not rely on available data. The government's position is that, in fact, both of those contentions are incorrect. The Joaquinan study may not be a perfect study. It may have a lot of internal weaknesses. However, that does not make it not the best available science. Under this Court's rulings in Kern County Farm Bureau Association Greenpeace Action, what is required by the agencies is they consider what is available, not that what is available be perfect or something like that. There is nothing that the agencies have ignored. Furthermore, in the Supplemental Biological Assessment, the agency considered both the Joaquinan study and the habitat parameters that were derived from that and also sort of preexisting standards that had been applied. And so- Let me ask you this. The 1995 consultations, of course, they predate the 1997 Joaquinan study. And are you saying that that study was not found to be the best science available at the time? At the time in 1995, Your Honor? No, at the time that currently. That science in the government's view is the best available science, and this project does conform to both the standards that were identified in the Joaquinan study and also the preexisting standards. So this is not a situation where the government has failed to comply with the newer standards because they have been vacated. We've complied with those standards. We've also complied with the older standards. The counsel has not identified any conceivable applicable body of standards that the government has not applied with, complied with in this particular project. I'd like to turn briefly to the 2006 rule set issue and for this purpose. Counsel contends that before this Court is some sort of rulemaking decision that the agency has made and that part of the Court's purview is to determine whether or not to enjoin the effectuation of that rule set. That is simply not the case. As questioning suggested, we don't view this memorandum as a rule set at all. Furthermore, as a matter of jurisdiction, and I apologize to the Court that the 60-day notice letter is not part of the excerpts that we provided to you. I can certainly provide that supplementally. It is in the administrative record at 37-006. The 60-day notice letter makes no statement that this suit is with respect to any sort of broad rulemaking that has been that has proceeded. If you look at the complaint as well at ER 55, the allegations are specific to the record of decision, the final supplemental environmental impact statement, and the supplemental biological assessment. So it's simply not the case that there is some broader rulemaking that the agency has gone through that is before this Court. Furthermore, there has been no rulemaking whatsoever because an internal memorandum of an agency's staff member trying to interpret a Court decision is simply not an agency action for purposes of either the APA or the Endangered Species Act. Unless there are further questions, we're willing to submit on our briefs. What's the present situation with the grizzly bears? What do you mean with respect? How are they doing? How many are still around? How many have been killed? I mean, the grizzly bears are not doing well in the Kootenai National Forest. I don't think there's any question as to that. The population trend data is not particularly good. It's bad. The agencies did consider that information. My understanding is, so in the record, there is a suggestion that between 30 to 40 grizzly bears are predicted to exist as a conservative estimate with a 90-plus percent probability that the population is in decline. My understanding is that supplemental research has shown that a conservative estimate is slightly higher, more on the order of 45 bears, but that the prediction as to population decline remains at 90-plus percent. However, I think what's important to note here is that though they are moving, the population is moving towards extinction. That's correct, Your Honor. There's no question about that. Well, I mean, there's an 8 percent question about that, but not a reasonable question. In view of that fact, and also at least at some points in the appellate process where there was some agreement to modification of the injection earlier, I understand there isn't now, but is there any reasonable prospect that it would be useful for the parties to attempt to mediate their differences and come up with some alternative program that's satisfactory to everyone, or is that not a useful option? I mean, the government is always willing to negotiate sort of in the abstract. I don't believe in this circumstance, given the fact that my understanding is that the Alliance's position is that no management should go on in this area until new standards are adopted, and the Forest Service's position is that management needs to continue. There are a number of problems on the forest. This is a forest that has been subject to fire suppression policies for over 100 years. There are fire risks. Furthermore, the habitat of both grizzly bear and other large ungulates is suboptimal because of that suppression policy. If you look at the excerpt of a record at ER 173, you'll find a discussion of the fact that the sort of predominance of a climax forest has reduced the amount of available berry and forage for grizzly bear and other species. And so in fact, going in and doing certain forms of thinning and cutting to help the forest look again more like it would have 100 years ago when you did have stand-clearing fires on a repetitive basis actually improves habitat for these species. And I don't – if you look at the briefs, there's no real contention that it is the clearing of trees itself that is causing a negative effect on grizzly bear. I think the contention is that it's the use of roads while grizzly bear may be in the area that could potentially lead to that negative effect. So to answer your question, Your Honor, I'm not sure that there's room for a negotiation or some sort of agreement, but we are, of course, willing to discuss it. You're really saying it's – as far as the government is concerned, it's more important to have trees on government property that can be harvested for commercial purposes than to save the grizzly bear from extinction. The grizzly bear really is – doesn't count much for – in the balance, right? That is not the government's position, Your Honor. I mean, one thing I would like to point out is that of these human-caused grizzly bear mortalities – So then why doesn't the government just stop selling timber in those areas and just let the grizzly bears, where their habitat is, just go on living? I think the Forest Service's and the Fish and Wildlife Service's perspective is that because of this hundred years of fire suppression, we have an artificial ecosystem for the grizzly bear. And so to some extent, management needs to occur in this forest in order to reduce fire danger, which can obviously kill grizzly bear, in order to improve habitat and winter forage for elk that the grizzly bear feed on, in order to improve berry fields, et cetera. And so some sort of management needs to occur. And I think furthermore, Your Honor, the evidence suggests that while the Forest Service controls 90 percent of the Kabanyak ecosystem, only one-third of the deaths of human-caused grizzly mortalities are occurring on Forest Service land. Most of these grizzly mortalities are occurring off of Forest Service land on the 5 percent of the land that is owned by the state and 5 percent that is privately owned and outside of the ecosystem altogether. So while there is certainly a problem here, even a critical – You mean they're being killed? That's correct. Why don't you just say that? Pardon me, Your Honor. They're being killed. And primarily, they're being killed by people with guns. They're being harvested. They're being poached. Many of the deaths are illegal. There are also deaths because of self-defense and because of mistaken identity. In the Supplemental Biological Assessment at ER 160, the Forest Service indicates that it is increasing its number of law enforcement personnel in the forest to try to reduce the amount of illegal harvest that's occurring. The sad fact is that the states, to some extent, sort of hold the bag here because they're the ones who are licensing hunters and they're the ones who are doing education with hunters as to how to differentiate between black bears and grizzly bears. And that's all recognized in the initial recovery plan at ER 448, that one of the primary threats to grizzly bears is hunting in one form or another and that the states are really the party that regulate hunting. And so to try to place the blame squarely and entirely on these management standards, I think simply misstates the facts on the ground. And certainly it was not arbitrary and capricious for the agencies to conclude, based on this data, that of the 90 percent of the ecosystem they own, only one-third of the deaths of grizzly bears, three over the course of five years, have occurred on that forest. And that's not to minimize those deaths. Obviously, the goal for the Forest Service and the federal government is to have no human mortalities. But the three over five years is an average that is less than what is predicted to be necessary. I think that the plaintiffs point to evidence in the record that suggests that no more than .9 grizzly bear per year can be killed and three over five years is a .6 grizzly bear per year average. And that's something that the Forest Service recognizes as a concern, but it's really outside the purview of this case because this case is about one project-specific decision. It's not about some broader sphere in which the plaintiffs have brought a failure-to-act claim or something of that nature. It's about this decision, and this decision improves grizzly bear habitat, maybe not as much as the plaintiffs would like, but it does increase the amount of core area, it reduces the amount of roads that are open. And for that reason, I think that there's no demonstration that the agencies have been arbitrary and capricious on this record. Unless there's anything further? Thank you, Your Honors. Thank you, Your Honors. My name is Tim Bechtold. Here are some points on rebuttal. The only healthy bear population in the lower 48 is in the Northern Continental Divide ecosystem, where there is in the Northern Continental Divide ecosystem, which consists primarily of Glacier Park and the Bob Marshall Wilderness. To say that bear needs habitat management is fallacious. The reason that bears are dying in the Kootenai is because the roads are driving them out. The 1995 biop, the 1999 review, and every single biological assessment since then has determined that roads are the reason that bears are dying. The reason that roads are the reason that bears die is because Montanans have guns in their trucks, and if they can drive there and they run into a bear, they kill it. For one reason or another, they kill it. They have guns on their ATVs, they kill it. It's the way it works. The Miller West Fisher ROD, which came out last month, now estimates that there's 15 to 20 bears left, and there's a 94% chance that the population is declining. So there we are, 15 to 20. The whole population is 15 to 20 bears, and the reason is because they're dying. And why are they dying? They're dying because of roads. Why are the roads there? Because those are the standards the Forest Service is using. Those standards are failing. The status quo is killing bears and driving them into extinction. That's the simple fact. And why is this not the best available science? And that's simply because of the Wakanen study, which they're dependent upon. The Wakanen study is fatally flawed because its whole premise is based upon six bears, two of which died immediately after the study, and one of which was a subadult female, which used a much larger, different size of home range. And so the whole premise upon which that study is based, which is an averaging of what the bears would use. So it's the least common denominator of what the bears would use, not what every bear in that study would use, but the least common denominator. That least common denominator is what they said, okay, well, let's use that. It's the least common denominator. But it's not effective. And the reason it's not effective is in the pudding. Bears are dying. Every single BA that the Forest Service has done has indicated that the population is declining, and more bears are likely to die. Now, if the best available science says, okay, well, we've considered the mortality trend, and we determined that it's not likely to adversely affect. So there. Now, the Forest Service's own directives on consultation say, well, if this is going to have a beneficial effect in the end, but is going to have some effect in the middle, then we have to have an unlikely to adversely affect ruling, and you need consultation. Now, that's found in the record at ER336. That's just a directive on what they should be doing. Now, they failed to do that, obviously, and that's one of the minor claims. But the big claim here is, you're right, Your Honor, it's the lack of using the best available science. Did they consider all the mortality data and say, well, we've looked at it, and it looks like they're dying, but we think we're going to do okay. And that is simply capricious. More than that, it's malicious. They've seen every bear that they've studied going to die. They brought a whole bunch of new bears in, and it's the activity in the forest. It's the logging and the road building. It's the bulldozers and the helicopters that are displacing the bears out of the core habitat and driving them to places where more people are on private lands. To say that logging is not killing bears directly is simply fallacious. What logging is doing is driving bears away from their core habitat. Road building is driving bears away from their core habitat. And not just for a day or two. It's for years. Logging projects go on for years. And so the core habitat is then compromised for years. And that's the reason bears are dying.  Any further questions before I run quickly out of time? One thing I'd like to address is, Your Honor, you asked about the motion to adjust the injunction. That was filed on Monday, and we filed a response yesterday. The Alliance and the Forest Service have been involved in discussions throughout the project for over a year about trying to reach some sort of compromise on that. And what the Alliance is asking the Forest Service to do is, Well, tell me how what you want to do is going to impact the bear. Nowhere in the district ranger's declarations does it say, Well, we want to do this because it's going to make things better for the bear. The government in this case is about roads and bears. It's not about whether or not we get the pile slasher or the bulldozer before the sun comes down. So that's the issues. The Alliance has been in the end. What we need, what we asked the Forest Service to provide was a whole series of information about which roads they want to use, when they want to use them, and the timelines, where this underburning wants to happen, where they want to do this slashing stuff. And that is yet to be provided. So it's the issue of which roads, when, and how that can impact the bear that the Alliance is interested in getting. And I would suggest to this Court, before any sort of modification takes place to the injunction, that it consider the impacts to the bear, which is the effect of this case, before it decides to rule on that motion. If you have no further questions, I thank you for the opportunity, and I thank you for hearing the case.
judges: Pregerson, Rymer, Graber